UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| JOSHUA CARY MYERS,<br><br>Petitioner,<br>v.<br>TIMOTHY FILSON, *et al.*,<br><br>Respondents. | Case No. 3:14-cv-00082-MMD-CBC<br><br>ORDER |

## I. SUMMARY

This counseled habeas petition comes before the Court for consideration on the merits.[1] (ECF No. 38.) Petitioner challenges his 2009 state court conviction, pursuant to a guilty plea, of first degree murder with a deadly weapon. Petitioner is currently serving a sentence of life without the possibility of parole, with a consecutive sentence for the deadly weapon enhancement.

## II. FACTUAL AND PROCEDURAL BACKGROUND

The charges against Petitioner arose out of the murder of George Eden in November or December 2008. (Exhibit "Exh." 4.)[2] Eden was found decomposing in his bathtub on December 16, 2008. (Exh. 2.) Petitioner confessed to his friend Jessica Tate that he had murdered Eden, and Tate contacted police. (*Id.*)

Petitioner was interviewed on December 29, 2008, and denied involvement in Eden's death. (*Id.*) Officers conducted a consensual search of Petitioner's residence and located a pair of sneakers with blood spots on them and treads that appeared to match a

---

[1]Respondents have answered (ECF No. 58), and Petitioner has replied (ECF No. 61).

[2]The exhibits cited in this order, comprising the relevant state court record, are located at ECF Nos. 39-41, 50.

shoeprint left at the crime scene. (*Id.*) Petitioner was interviewed a second time that day, and this time stated he had found Eden's dead body about a week-and-a-half prior. (*Id.*) He said that he fled the residence upon finding Eden's body, but returned a few days later to take some of Eden's belongings, including his car. (*Id.*)

On January 2, 2009, Petitioner was interviewed again. (*Id.*) This time he claimed to have witnessed Eden's murder through Eden's sliding glass door, and pointed out where Eden was stabbed, which corresponded with Eden's injuries. (*Id.*) Petitioner stated that he later went inside and found Eden's body in the bathroom. (*Id.*) Later during the interview, however, Petitioner said that he actually found Eden's body in the living room, wrapped it in a rug and dragged it to the bathroom. (*Id.*) Petitioner then changed his story again, stating that he was inside when Eden was murdered, but that he could not remember everything and was not sure if he killed Eden. (*Id.*)

On March 19, 2009, police interviewed an acquaintance of Petitioner, who implicated Petitioner in Eden's murder. (*Id.*) That same day, police interviewed Petitioner. This time, Petitioner admitted to murdering Eden after Eden refused to pay Petitioner for methamphetamine and had reached out to strike Petitioner. (*Id.*)[3] Petitioner was thereafter arrested. (*Id.*)

On April 2, 2009, Roger Whomes appeared on Petitioner's behalf. (Exh. 7.) On April 29, 2009, Petitioner waived his preliminary hearing with a handwritten notation that indicated he would enter a plea of guilty. (Exh. 8.) The plea agreement provided that the parties would jointly recommend a sentence of life with the possibility of parole after twenty years on the murder charge but acknowledged that the court could sentence Petitioner up to life in prison without the possibility of parole. The agreement also left the parties free to argue a sentence for the deadly weapon enhancement. (Exh. 11.)

On May 19, 2009, Petitioner entered his guilty plea. (Exh. 12.) During the canvass, Petitioner indicated that he had read the plea memorandum and understood that while

---

[3](*See also* Exh. 3.)

2

the parties were recommending life with the possibility of parole after twenty years, the court could sentence him differently. (Exh. 12 (Tr. 6-9).) Asked whether he was satisfied that he had enough time to speak to his lawyer and any other person who he believed important to making the decision to plead guilty to first degree murder, Petitioner responded "yes." (*Id.* at 9.) Petitioner also responded "yes" when asked whether he'd had an opportunity to read the police reports, look at any crime scene photos, and consider all of the evidence that would form the basis for any defense that he might want to assert. (*Id.*) When asked whether he was receiving any medical or psychiatric treatment, Petitioner indicated that he had been on "Cylaris" since shortly after being arrested. (*Id.* at 10.) He indicated that he did not know why he was being given that medication and denied any mental health issues. (*Id.* at 11.) The court asked whether the medication affected Petitioner's ability to understand the proceedings, and Petitioner answered "no." (*Id.* at 11-12.) Petitioner indicated he was satisfied with his legal representation and again indicated he had had sufficient opportunity to discuss the charges and any potential defenses with his attorney. (*Id.* at 16.) He denied that anyone had made any threats to force him to plead guilty. (*Id.* at 18.) Again asked whether he had sufficient time to make his decision, Petitioner responded "yes." (*Id.*)

On September 3, 2009, Petitioner submitted a letter to the court seeking to withdraw his plea. (*See* Exh. 13.) Petitioner asserted he had been under the influence of medications that put him in a fog-like state, that he did not have sufficient time to read his discovery and consider the plea, and that his attorney had coerced him into pleading guilty. (Exh. 14.) The court granted Whomes' request to withdraw and appointed new counsel. The court also ordered that Petitioner's medical records be subpoenaed. The court advised Petitioner that new counsel would meet with him and file a written motion but also warned that attorneys had no obligation to file fruitless motions or do everything Petitioner asked. (Exh. 13.)

On September 24, 2009, John Ohlson was appointed to represent Petitioner. (Exh. 16.) However, Ohlson refused to file a motion to withdraw the guilty plea, asserting that

he could not ethically do so because the plea was in Petitioner's favor and he believed Petitioner was likely to be convicted if he chose to go to trial, which would likely result in a higher sentence. (Exh. 33.) The court ordered Ohlson to appear as standby counsel and assist Petitioner with the filing of his motion. (*Id.*) But Ohlson did not do so; Petitioner filed his own *pro se* motion, which indicated that Ohlson never provided him with any legal materials that he had requested. (Exh. 17.) In his motion, Petitioner indicated that while Ohlson was initially supportive of moving to withdraw, after reviewing the discovery he told Petitioner "you're screwed" and advised him against withdrawing his plea. (*Id.*)

On February 5, 2010, an evidentiary hearing took place. (Exh. 19.) At the hearing, Whomes testified that he reviewed all the discovery, that Petitioner had all the discovery, and that they discussed things extensively before Petitioner entered his plea. (*Id.* at 74, 83-84.) Although Petitioner frequently brought up self-defense, Whomes did not believe it was a viable defense and repeatedly explained to Petitioner why. (*Id.* at 78-80.) Petitioner also wondered whether he could obtain relief under *Miranda*, but counsel explained to him that *Miranda* did not apply to most of his police interviews and that while there was a potential *Miranda* issue with respect to the last interview, suppressing those statements would do little good in light of all the other admissible incriminating statements Petitioner had made before that time. (*Id.* at 80.)

By the time he entered his plea, Whomes felt, Petitioner understood why self-defense was not a viable defense and he fully understood what was going on. (*Id.* at 88.) Whomes testified that he and Petitioner had a fine and amicable relationship and he denied ever coercing or threatening Petitioner to plead. (*Id.* at 77, 82, 86-87.) Ohlson's cross-examination of Whomes focused not on this last issue but instead on Whomes' history, and possible future, as a prosecutor. (*See id.* at 93-96.)

Whomes' supervisor, Jennifer Lunt, testified that she met with Petitioner several times regarding his request to withdraw his guilty plea and that she had strongly counseled him against doing so in light of the strength of the state's case. (*Id.* at 53-55.) Lunt also advised Petitioner she did not believe he would be successful with a self-

4

defense because the victim was a 61-year-old man who was ill and had trouble walking. (*Id.* at 56.) Lunt testified that their office did investigate before the plea and continued to do so afterward. (*Id.* at 59-60.)

Finally, the defense investigator, Rocco Lovetere, testified. He confirmed that Petitioner received all the discovery they had and that he and Whomes went over it with Petitioner and explained what they thought would happen at trial. (*Id.* at 101-02.) Lovetere never felt that Petitioner was unable to comprehend what he was saying or understand what was going on. (*Id.* at 104.) But Petitioner did repeatedly bring up self-defense, and Whomes and Lovetere had to explain why it wasn't viable several times, "to the point of exasperation." (*Id.* at 106.) Lovetere admitted he got exasperated after the third or fourth time of explaining why self-defense was not an option, and by the third time of explaining the issue to Petitioner Whomes told Petitioner to "shut up." (*Id.* at 106-09.) Petitioner did shut up and was visibly disturbed—as was Lovetere—as well as a bit intimidated. (*Id.* at 109, 113.) After this happened, Lovetere took over the conversation and explained things more calmly. (*Id.* at 111.) Lovetere testified that Whomes yelled at Petitioner twice and slammed his hand on the table, but that this occurred before any plea negotiations and that Whomes never yelled at Petitioner that he must plead. (*Id.* at 108-09, 112-13, 118.) Despite Whomes' behavior, Lovetere felt that most of the time Petitioner and Whomes were able to discuss the case rationally, and Lovetere did not believe Petitioner was coerced into his plea. (*Id.* at 111-12.) Petitioner was told a number of times that the decision was his. (*Id.* at 117.) And in the end it was Petitioner's decision to enter the plea. (*Id.* at 107.)

Petitioner argued that he had been trying to get his attorneys to withdraw his plea since about a month after he entered his plea, but they kept trying to talk him out of it. (*Id.* (Tr. 11-12).) When the court asked what defense he might have to the charges, Petitioner said he wanted to save that for trial, but later said he no longer wanted to pursue self-defense and would "more for going towards not murder one." (*Id.* at 120.)

On the stand, and later in a written order, the trial court denied the motion. (*Id.* at 126-29; Exh. 23.) In relevant part, the court found credible Lovetere's testimony that Whomes yelled at Petitioner but that the yelling did not occur during discussions about a plea. (Exh. 19 (Tr. 128).) The court also noted that every single attorney who testified said the plea was the best outcome for Petitioner because it gave him the opportunity to attain freedom at some point. (*Id.* at 128-29.)

At the end of the hearing, Ohlson was allowed to withdraw and new counsel was appointed. New counsel, Lidia Stiglich, assisted Petitioner in drafting a motion to withdraw the guilty plea or for reconsideration on the grounds that Petitioner did not have meaningful assistance of counsel with respect to his previous motion and that new evidence showed Petitioner had begun to seek withdrawal of his plea within a month of entering it. (Exh. 25.) The trial court denied the motion prior to sentencing, concluding that nothing in the motion persuaded it to reconsider its decision, even in light of the new evidence. (Exh. 28 (Tr. 23).)

Petitioner was sentenced, judgment entered, and a notice of appeal filed. (Exhs. 28, 31, 32.) Petitioner pursued state postconviction habeas proceedings and, thereafter, this federal habeas action.

## III. LEGAL STANDARD

### A. Merits

28 U.S.C. § 2254(d) provides the legal standards for this Court's consideration of the merits of the petition in this case:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

6

AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone,* 535 U.S. 685, 693-694 (2002). This court's ability to grant a writ is limited to cases where "there is no possibility fairminded jurists could disagree that the state court's decision conflicts with [Supreme Court] precedents." *Harrington v. Richter*, 562 U.S. 86, 102 (2011). The Supreme Court has emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade*, 538 U.S. 63, 75 (2003)); *see also Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (describing the AEDPA standard as "a difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt") (internal quotation marks and citations omitted).

A state court decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254, "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [the Supreme Court's] precedent." *Andrade*, 538 U.S. 63 (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000), and citing *Bell*, 535 U.S. at 694).

A state court decision is an unreasonable application of clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d), "if the state court identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Andrade*, 538 U.S. at 74 (quoting *Williams*, 529 U.S. at 413). The "unreasonable application" clause requires the state court decision to be more than incorrect or erroneous; the state court's application of clearly established law must be objectively unreasonable. *Id.* (quoting *Williams*, 529 U.S. at 409).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of § 2254(d)(2) controls on federal habeas review. *E.g.*, *Lambert v. Blodgett*, 393 F.3d 943, 972 (9th Cir. 2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." *Id.* at 973. Rather, AEDPA requires substantially more deference:

> .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox*, 366 F.3d 992, 1000 (9th Cir. 2004); *see also Lambert*, 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court factual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *See Cullen*, 563 U.S. at 181. The state courts' decisions on the merits are entitled to deference under AEDPA and may not be disturbed unless they were ones "with which no fairminded jurist could agree." *Davis v. Ayala*, -- U.S. --, 135 S. Ct. 2187, 2208 (2015).

### B. Ineffective Assistance of Counsel

Ineffective assistance of counsel claims are governed by *Strickland v. Washington*, 466 U.S. 668 (1984). Under *Strickland*, a petitioner must satisfy two prongs to obtain habeas relief—deficient performance by counsel and prejudice. 466 U.S. at 687. With respect to the performance prong, a petitioner must carry the burden of demonstrating that his counsel's performance was so deficient that it fell below an "objective standard of reasonableness." *Id.* at 688. "'Judicial scrutiny of counsel's performance must be highly deferential,' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" *Knowles v. Mirzayance*,

556 U.S. 111, 124 (2009) (citation omitted). In assessing prejudice, the court "must ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [counsel's] errors." *Id.* at 696.

## IV. DISCUSSION

### A. Ground 1

In Ground 1, Petitioner asserts that he did not knowingly, intelligently, or voluntarily enter his plea of guilty because (1) counsel coerced him into pleading guilty and (2) counsel failed to conduct an adequate pre-plea investigation.[4] (ECF No. 38 at 10.)

#### 1. Ground 1(a)

In Ground 1(a), Petitioner asserts that Whomes intimidated and bullied him into pleading guilty, and that the coercion began immediately with pressure to enter a plea. (*Id.* at 10.) He asserts that when he questioned or pushed back against Whomes, Whomes would let his anger and size intimidate and control Petitioner, that he would yell at Petitioner and call him "f******* stupid" and that he would get his "a** handed to him in court." He alleges that even Lovetere was disturbed by Whomes' treatment of Petitioner.

The trial court addressed Petitioner's allegation as follow:

> The Defendant's final allegation is that his attorney, Roger Whomes, coerced and/or forced his plea, and that Roger Whomes knew the Defendant was not coherent, comprehending or understanding what was occurring, and that the Defendant was not able to make sensible decisions. This allegation is also belied by the record of the Arraignment held on May 19, 2009, by the Guilty Plea Memorandum signed by the Defendant and filed in this case, and by the testimony of Roger Whomes and Rocco Lovetere. Concerning Roger Whomes yelling at the Defendant, Rocco Lovetere testified that when this occurred; it was during their initial interviews with the Defendant; it was done to get the conversation away from a question that had been repeatedly answered; it was done prior to the State even making an negotiated plea offer to the defendant; the conversation between Roger Whomes and the Defendant seemed amicable following these two events; the interviews always ended amicably;

---
[4]Petitioner does not in this action assert that the medication he was taking prevented him from entering a knowing, voluntary and intelligent plea, which was one of his primary claims in the state court. This is, perhaps, because the evidence presented at the evidentiary hearing was fairly overwhelming that Petitioner did not suffer any cognitive deficits from his medication. (*See* Exh. 19 (Tr. 21-29, 42-45, 66-70).)

9

and according to Rocco Lovetere, the plea was not coerced. Equally important, the Defendant had a good working relationship with both Rocco Lovetere and Roger Whomes following the discussions in question. The Court finds the testimony of Rocco Lovetere to be credible and appropriate. Moreover, both Roger Whomes and Rocco Lovetere reiterated that the ultimate decision of whether or not the Defendant should plead guilty was one only the Defendant could make. The Court finds that the guilty plea was not coerced.

(Exh. 23 at 6-7.)

Finding that the trial court did not abuse its discretion in denying Petitioner's presentence motion to withdraw his plea, the Nevada Supreme Court addressed this claim as follows:

> [E]vidence introduced at the evidentiary hearing on the motion showed that during two meetings, Myers' counsel pounded the table and "yelled" at Myers after counsel had repeatedly explained to him that a self-defense theory was not viable. Additionally, those two meetings ended amicably and transpired before plea negotiations commenced. Counsel and the defense investigator testified that they advised Myers that the decision to plead guilty was his. Further, Myers denied any coercion during the plea canvass.

(Exh. 38 at 2.)[5]

Petitioner argues that the state courts' factual findings were not reasonable. First, Petitioner asserts that the conclusion that the plea was not coerced because Petitioner's meetings with Whomes ended amicably ignored the effect that Whomes' bullying had on Petitioner—specifically, Petitioner argues that the meetings ended amicably because he was afraid to provoke Whomes further. (ECF No. 61 at 11.) The state courts' factual findings are entitled to deference unless rebutted by clear and convincing evidence. While Petitioner's argument is certainly plausible and might have been accepted by another court, this Court cannot conclude that state courts were objectively unreasonable in concluding otherwise. Lovetere testified that despite Whomes' behavior, which upset even Lovetere, Petitioner was not coerced and that he entered the plea of his own free will. Petitioner also appears to suggest that the state courts were unreasonable in concluding that no bullying occurred in connection with plea negotiations, because

---

[5]Citation is to the original page in the document.

10

Petitioner argues that the bullying began immediately when Whomes pressured Petitioner to waive the preliminary hearing in favor of entering a plea. The state courts were not objectively unreasonable in not reaching this conclusion. There were several weeks between Whomes' appearance and the waiver of the preliminary hearing, enough time for counsel to review and discuss the case with Petitioner before being presented a plea offer. The state courts accepted Lovetere's representation that there was no yelling in connection with plea discussions, and Petitioner has not presented clear and convincing evidence that this conclusion was objectively unreasonable.

Nor were the state courts' legal determinations objectively unreasonable. The federal constitutional guarantee of due process of law requires that a guilty plea be knowing, intelligent and voluntary. *See Brady v. United States*, 397 U.S. 742, 748 (1970); *Boykin v. Alabama*, 395 U.S. 238, 242 (1969); *United States v. Delgado-Ramos*, 635 F.3d 1237, 1239 (9th Cir. 2011). "The voluntariness of [a petitioner's] guilty plea can be determined only by considering all of the relevant circumstances surrounding it." *Brady*, 397 U.S. at 749. Those circumstances include "the subjective state of mind of the defendant . . . ." *Iaea v. Sunn*, 800 F.2d 861, 866 (9th Cir. 1986).

Addressing the "standard as to the voluntariness of guilty pleas," the Supreme Court has stated:

> (A) plea of guilty entered by one fully aware of the direct consequences, including the actual value of any commitments made to him by the court, prosecutor, or his own counsel, must stand unless induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper as having no proper relationship to the prosecutor's business (e.g. bribes).

*Brady*, 397 U.S. at 755 (quoting *Shelton v. United States*, 246 F.2d 571, 572 n.2 (5th Cir. 1957) (en banc), *rev'd on other grounds*, 356 U.S. 26 (1958)); *see also North Carolina v. Alford*, 400 U.S. 25, 31 (1970) (noting that the "longstanding test for determining the validity of a guilty plea is 'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'").

In *Blackledge v. Allison*, 431 U.S. 63 (1977), the Supreme Court addressed the evidentiary weight of the record of a plea proceeding when the plea is subsequently subject to a collateral challenge. While noting that the defendant's representations at the time of his guilty plea are not "invariably insurmountable" when challenging the voluntariness of his plea, the court stated that, nonetheless, the defendant's representations, as well as any findings made by the judge accepting the plea, "constitute a formidable barrier in any subsequent collateral proceedings" and that "[s]olemn declarations in open court carry a strong presumption of verity." *Blackledge*, 431 U.S. at 74; *see also Muth v. Fondren*, 676 F.3d 815, 821 (9th Cir. 2012); *Little v. Crawford*, 449 F.3d 1075, 1081 (9th Cir. 2006).

Petitioner told the trial court, under oath, that no one had threatened him into entering a guilty plea and that he had sufficient time to discuss the case with his attorney, review the evidence and consider the plea before deciding to take it. Lovetere, who witnessed the allegedly coercive behavior and was disturbed by it himself, did not feel it resulted in the entry of an involuntary, unknowing, or unintelligent plea. In light of the finding that Petitioner was not coerced, and his solemn statements made under oath, it was not objectively unreasonable for the state courts to find that Petitioner's plea was not coerced.

2.   Ground 1(b)

In Ground 1(b), Petitioner argues that the defense conducted little, if any, investigation before advising Petitioner to plead. (ECF No. 38 at 13-14.) The Nevada Supreme Court addressed this claim as follows: "[Petitioner] raises a vague, perfunctory claim that no investigation was completed before he pleaded guilty. Absent from [Petitioner's] claim is any explanation of what investigation should have been conducted or how any information discovered would have affected his decision to plead guilty." (Exh. 38 at 2.)

Petitioner argues that there was simply no way counsel could have investigated his case enough before advising him to plea. But this is beside the point. Petitioner has

not established any prejudice from any failure to investigate, either with respect to his defense or with respect to his decision to enter the guilty plea. Petitioner has not therefore established that the state courts were objectively unreasonable in rejecting this claim.

Petitioner is not entitled to relief on Ground 1 of the petition.

**B. Ground 2**

In Ground 2, Petitioner asserts that he received ineffective assistance of counsel because (1) counsel failed to move to suppress Petitioner's statement to police; and (2) counsel failed to assist him in his motion to withdraw guilty plea proceedings. (ECF No. 38 at 14-17.)

1. Ground 2(a)

In Ground 2(a), Petitioner asserts that counsel was ineffective for failing to move to suppress his statement to police on March 19, 2009. (ECF No. 38 at 15-16.) He asserts that had counsel filed a motion to suppress, he would not have pleaded guilty and instead would have gone to trial. (*Id.*) Petitioner does not, in his petition, assert that counsel should have moved to suppress any of other Petitioner's other statements.

The Nevada Supreme Court addressed this claim as follows:

> The district court found that Myers was not entitled to an evidentiary hearing on his claims that counsel was ineffective for (1) failing to suppress statements that he made to the police without a *Miranda* warning. . . . Based on testimony presented during the evidentiary hearing on Myers' motion to withdraw guilty plea, the district court found that defense counsel and Myers discussed the *Miranda* issues before Myers entered his guilty plea, counsel explained to Myers that *Miranda* was not applicable to most of his interviews because he was not detained and had participated voluntarily, counsel explained that the damage from these interviews was damning and could not be cured by suppressing the remaining interviews, and Myers appeared to understand counsel's explanations and did not raise the issue again. . . .
>
> Our review of the record reveals that the district court's factual findings are supported by substantial evidence and are not clearly wrong, and Myers has not demonstrated that the district court erred as a matter of law.

(Exh. 59 at 1-2.)[6]

---

[6] Citation is to the original pages of the document.

13

Initially, Respondents argue that this claim is precluded by *Tollett v. Henderson*, 411 U.S. 258 (1973). In *Tollett*, the United States Supreme Court held that "[w]hen a criminal defendant has solemnly admitted in open court that he is in fact guilty of the offense with which he is charged, he may not thereafter raise independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of the guilty plea." *Id.* at 1608. However, guilty pleas do not waive all pre-plea claims, as petitioners may still assert that ineffective assistance of counsel resulted in a plea that was involuntary, unknowing, or unintelligent. *See Hill v. Lockhart*, 474 U.S. 52, 56 (1985). Both the Ninth Circuit and the Supreme Court have addressed on their merits claims that a plea was involuntary due to counsel's failure to file a motion to suppress. *See, e.g., Premo v. Moore*, 562 U.S. 115, 118 (2011). The claim is not therefore waived under *Tollett*.

Petitioner has not established that the state courts were objectively unreasonable in their ruling on this claim. Aside from Petitioner's own confession, both Tate and Calhoun implicated Petitioner in Eden's murder. Additionally, Petitioner's first interviews with police resulted in several incriminating admissions.[7] It was not unreasonable for counsel to conclude that seeking suppression of the March 2009 interview would have been futile insofar as either plea negotiations or trial were concerned because there was a substantial amount of evidence against Petitioner regardless of his final statements. It was at least not objectively unreasonable for the state courts to so conclude.

### 2. Ground 2(b)

In Ground 2(b), Petitioner asserts that he did not receive effective assistance of counsel with respect to his motion to withdraw plea. (ECF No. 38 at 16-17.) Petitioner asserts that although counsel was appointed to him to file a motion to withdraw, counsel refused to do so "because the plea bargain was in Petitioner's favor" and did not assist

---

[7]Petitioner argues for the first time in his reply that counsel could have moved to suppress Petitioner's prior statements, as well, on the grounds that Petitioner was under the influence of drugs at the time he gave them. The Court, however, will not consider arguments raised for the first time in the reply. *See Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) (The "court need not consider arguments raised for the first time in a reply brief.")

14

Petitioner, as ordered by the court, in research for or drafting of his own *pro se* motion to withdraw. Petitioner asserts that counsel's position that he could not ethically sign a motion to withdraw plea was "inane," especially because the plea really wasn't in Petitioner's favor as it allowed the court to impose life without the possibility of parole and the State retained the right to argue for any sentence on the deadly weapon enhancement. (*Id.* at 18.) He argues that although counsel assisted him in the evidentiary hearing, counsel's cross-examination of Whomes was minimal and elicited nothing. (*Id.*)

The Court previously found this claim technically exhausted but procedurally defaulted and deferred resolution of whether Petitioner could establish cause and prejudice pursuant to *Martinez v. Ryan*, 566 U.S. 1 (2012). (ECF No. 57.) Under *Martinez*, the United States Supreme Court created a narrow, equitable exception to the general rule that ineffective assistance of postconviction counsel cannot provide cause for a procedural default, by holding that petitioners in some circumstances may establish cause where a substantial claim of ineffective assistance of trial counsel was not raised in initial-review collateral proceedings due to the absence or ineffective assistance of postconviction counsel. *See id.* at 16-17. Having considered Petitioner's claim, the Court cannot conclude that postconviction counsel was ineffective for failing to raise this claim or that the failure cause Petitioner prejudice. For the same reasons, the claim fails on the merits.[8]

Regardless of the reasonableness of Ohlson's refusal to file a motion on Petitioner's behalf, it is difficult to conclude that Petitioner suffered any prejudice from his refusal and his failure to assist Petitioner with the filing of the *pro se* motion. The trial court conducted an extensive evidentiary hearing, and following the hearing new counsel

---

[8]The Court also notes that at least part of this claim was raised in initial-review collateral proceedings, by Petitioner himself, but was not raised on appeal, and to that extent cannot be saved by *Martinez*. (Exh. 40); *see Martinez*, 566 U.S. at 16 (declining to extend exception to *Coleman* to "attorney errors in other kinds of proceedings, including *appeals from initial-review collateral proceedings*, second or successive collateral proceedings, and petitions for discretionary review in a State's appellate courts") (emphasis added).

assisted Petitioner in filing a renewed motion to withdraw guilty plea, which clearly set forth his arguments and provided additional evidence. Even with this assistance, the result, in the end, was the same. Petitioner therefore cannot show that Ohlson's failure to assist Petitioner caused him prejudice.

Petitioner's argument regarding Ohlson's limited cross-examination of Whomes is likewise unavailing. Petitioner asserts that Ohlson should have questioned Whomes about the fact that the plea agreement was not actually beneficial to Petitioner. While it perhaps would have bolstered Petitioner's argument had Ohlson explored the issue during the evidentiary hearing, the Court cannot say there is a reasonable likelihood that the outcome of the proceedings would have been different had he done so. That the benefit to Petitioner from the plea agreement was arguably slight was apparent on the face of the agreement, and the trial court was aware of the agreement's terms. Despite this, the trial court held that the plea was knowing, voluntary and intelligent. After all, even a slight benefit is a benefit, particularly where the evidence against Petitioner was as strong as it appeared.

In the end, Petitioner has not shown both deficient performance and prejudice with respect to any of the claims raised in Ground 2(b). Ground 2(b) is therefore procedurally defaulted, and Petitioner has not established cause and prejudice for the default. In the alternative, Petitioner is not entitled to relief on the merits of Ground 2(b).

**C.     Ground 3**

In Ground 3, Petitioner asserts that the cumulative effect of the errors of counsel deprived him of his due process rights. (ECF No. 38 at 18.) The Court previously held that this claim was technically exhausted but procedurally defaulted, and that the only cause argument on which Petitioner relies is ineffective assistance of postconviction counsel.

"[T]he combined effect of multiple trial court errors violates due process where it renders the resulting criminal trial fundamentally unfair." *Parle v. Runnels*, 505 F.3d 922, 927 (9th Cir. 2007). "[C]umulative error warrants habeas relief only where the errors have

'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* "Such 'infection' occurs where the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'" *Id.* (citations omitted).

Having considered all Petitioner's claims in this matter, the Court is not persuaded either that postconviction counsel was ineffective for failing to assert a cumulative error claim in initial-review collateral proceedings, or that Petitioner suffered actual prejudice therefrom. Considering all the alleged errors of counsel together, Petitioner has not established that the errors resulted in violation of his due process rights.

Petitioner is not therefore entitled to relief on Ground 3 of the petition.

## V. CERTIFICATE OF APPEALABILITY

In order to proceed with an appeal, Petitioner must receive a certificate of appealability. *See* 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22; 9th Cir. R. 22-1; *Allen v. Ornoski*, 435 F.3d 946, 950-951 (9th Cir. 2006); *see also United States v. Mikels*, 236 F.3d 550, 551-52 (9th Cir. 2001). Generally, a petitioner must make "a substantial showing of the denial of a constitutional right" to warrant a certificate of appealability. *Allen*, 435 F.3d at 951; 28 U.S.C. § 2253(c)(2); *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000). "The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Allen*, 435 F.3d at 951 (quoting *Slack*, 529 U.S. at 484). In order to meet this threshold inquiry, the petitioner has the burden of demonstrating that the issues are debatable among jurists of reason; that a court could resolve the issues differently; or that the questions are adequate to deserve encouragement to proceed further. *See id.*

The Court has considered the issues raised by Petitioner with respect to whether they satisfy the standard for issuance of a certificate of appealability, and determines that none meet that standard. Accordingly, the Court will deny Petitioner a certificate of appealability.

**VI. CONCLUSION**

It is therefore ordered that the petition for writ of habeas corpus in this case (ECF No. 38) is denied, and this action is dismissed with prejudice.

It is further ordered that Petitioner is denied a certificate of appealability. The Clerk of Court is directed to enter final judgment accordingly and close this case.

DATED THIS 29th day of March 2019.

_____
MIRANDA M. DU
UNITED STATES DISTRICT JUDGE